ESPINOSA, J., dissenting.
 

 "'Twill be recorded for a precedent, And many an error by the same example Will rush into the state." W. Shakespeare, The Merchant of Venice, act IV, sc. i.
 

 I write this dissenting opinion not to address the concurring opinion of Justice Palmer, who continues to believe that
 
 State v. Santiago,
 

 318 Conn. 1
 
 ,
 
 122 A.3d 1
 
 (2015), was rightly decided.
 
 [1]
 
 I have already addressed the merits of
 
 Santiago,
 
 or rather, the lack thereof, in my dissenting opinion in that case. Id., at 388,
 
 122 A.3d 1
 
 . Of course, my dissenting opinion in
 
 Santiago
 
 pales in comparison to the dissent issued by Chief Justice Rogers, who wrote that "[e]very step" of the majority's analysis in that decision was "fundamentally flawed"; id., at 231,
 
 122 A.3d 1
 
 ; and then, over the course of 110 blistering pages, painstakingly and methodically exposed those flaws one by one, ripping the majority's all too vulnerable analysis to shreds, revealing it to be both a violation of the principle of stare decisis; id., at 238,
 
 122 A.3d 1
 
 ; and so lacking in foundation that it was built upon "a house of cards, falling under the slightest breath of scrutiny." Id., at 233,
 
 122 A.3d 1
 
 . Accordingly, I refer any readers who retain doubts as to whether
 
 Santiago
 
 was clearly wrong to the dissenting opinion of the Chief Justice. Id., at 231-341,
 
 122 A.3d 1
 
 .
 

 I also need not address the barely two paragraph disdainful majority opinion in the present case. I do note, however, that it is hardly surprising that the majority has decided to issue its opinion as a terse and dismissive per curiam, suggesting that the state's arguments in favor of overruling
 
 Santiago
 
 do not merit serious consideration. This is particularly troubling considering the importance of the issue presented in this appeal. It is this court's duty to give full consideration to the claims of the parties who come before it. In many cases less significant than the present one, the court as a matter of courtesy and respect answers all the claims raised by the parties, even when the court may believe that such claims lack merit. Dismissing the state's arguments in the present case in a
 
 per curiam
 
 opinion creates the appearance that the outcome was predisposed, and that oral argument was allowed merely to avoid the perception that the state was being treated unfairly. Indeed, Mark Rademacher, the assistant public defender who argued this appeal, stated that the purpose of granting the state's motion for oral argument was " '[to make] the state feel good about losing.' " J. Charlton, "Connecticut High Court Revisits Death Penalty," Fox 61, January 7, 2016, available at http://fox61.com/2016/01/07/Connecticut-high-court-to-revisit-death-penalty/ (last visited May 16, 2016).
 

 I write to address the concurring opinion of the Chief Justice who frames the issue presented in this appeal in this manner: May the court overrule a recently established precedent solely because there has been a panel change since the now challenged decision? Taking that as her starting point, the Chief Justice voices the concern that overruling
 
 Santiago
 
 would call into question the integrity of this court because doing so: (1) would create the appearance that the court is governed by the whims of individual justices rather than the rule of law; (2) would create the public perception that the result
 of a case depends on the composition of the panel; and (3) would undermine the stability and predictability of the law, on which litigants rely. The short answer to those concerns is that they are unjustified and irrelevant when the prior precedent at issue is clearly wrong. As I explain in this dissenting opinion, this is particularly true when the clearly wrong, recently decided case has violated the doctrine of stare decisis-under those circumstances, that doctrine
 
 requires
 
 that the prior precedent be overruled.
 
 Adarand Constructors, Inc. v. Pena,
 

 515 U.S. 200
 
 , 233-34,
 
 115 S.Ct. 2097
 
 ,
 
 132 L.Ed.2d 158
 
 (1995). The position of the Chief Justice in the present case, therefore, is irreconcilable with her position in her dissenting opinion in
 
 Santiago,
 
 that the decision was clearly wrong. See
 
 State v. Santiago,
 
 supra,
 
 318 Conn. at 231
 
 ,
 
 122 A.3d 1
 
 . A panel change cannot insulate a clearly wrong decision from being overruled.
 
 [2]
 

 Because of the importance of the issue presented in this appeal, a longer response is necessary. This court's appearance as an impartial decision-making body, governed by the rule of law rather than the proclivities of individual panel members, is vital. No one disputes that, nor does anyone question the integral role that stability and predictability play in our legal system. But the protestations of the Chief Justice are predicated on a straw man that employs post hoc reasoning and finds no support in our stare decisis jurisprudence. In this dissent, I consider these two flaws in the analysis of the Chief Justice, and
 thereby illustrate the central flaw in her opinion-it overlooks the overarching stare decisis principle of which even playwrights are aware-a clearly wrong decision is dangerous, because it will be relied on as precedent. As this court frequently has noted, "[i]t is more important that the court should be
 right upon later and more elaborate consideration of the cases than consistent with previous declarations." (Internal quotation marks omitted.)
 
 Conway v. Wilton,
 

 238 Conn. 653
 
 , 660,
 
 680 A.2d 242
 
 (1996). And when a decision is so clearly wrong that the Chief Justice felt compelled to write in her dissent that the "fundamentally flawed" analysis suffers from a "complete absence of any historical support," relies on "irrelevant" factors;
 
 State v. Santiago,
 
 supra,
 
 318 Conn. at 231
 
 ,
 
 122 A.3d 1
 
 ; is so "riddled with non sequiturs ... [that] to enumerate all of them would greatly and unnecessarily increase the length of this [110 page] dissenting opinion," engages in "speculation" and relies on propositions that are "devoid of any substantive content"; id., at 242-43,
 
 122 A.3d 1
 
 ; "misstates both the eighth amendment jurisprudence of the United States Supreme Court and the state constitutional jurisprudence of this court"; id., at 249,
 
 122 A.3d 1
 
 ; is "untenable"; id., at 254,
 
 122 A.3d 1
 
 ; "illogical"; id., at 256,
 
 122 A.3d 1
 
 ; "troubling"; id., at 257,
 
 122 A.3d 1
 
 ; and "deliberately vague"; id., at 261,
 
 122 A.3d 1
 
 ; is predicated on a legislative history that was created by "cherry pick[ing] extra-record sources that provide slanted and untested explanations for the history of the death penalty in this state";
 
 id.,
 
 at 264 n. 30,
 
 122 A.3d 1
 
 ; and constitutes a "judicial invalidation, without constitutional basis, of the political will of the people"; id., at 278,
 
 122 A.3d 1
 
 ; that decision, which itself violated the doctrine of stare decisis, does not merit the application of that doctrine.
 

 I
 

 POST HOC STRAW MEN ARE UNPERSUASIVE
 

 The Chief Justice misstates the issue presented in this appeal, framing it as whether this court should overrule a recently decided case
 
 because
 
 the panel has subsequently changed. By formulating the issue in that manner, she erects a straw man. Obviously, if this court were to overrule a decision merely
 
 because
 
 the panel had changed, the court would do damage to the rule
 of law. That causal connection exists, however, only in the opinion of the Chief Justice, who certainly finds herself more than capable of knocking down the proposition she has put forward. But the mere fact that a decision overruling
 
 Santiago
 
 would have occurred after the panel changed does not necessitate the conclusion that the panel change would have
 
 caused
 
 the court to overrule
 
 Santiago,
 
 and is nothing more than a logical fallacy, an example of "post hoc, ergo propter hoc"
 
 [3]
 
 reasoning.
 

 On another level, what the Chief Justice appears to suggest is that, because the panel in
 
 Santiago
 
 would have been unwilling to overrule that decision, the current panel is prevented from doing so. She even goes so far as to tally the unchanged votes of the remaining three members of the majority panel from
 
 Santiago
 
 that are on the panel for this appeal, counting that as support for her decision to accord stare decisis effect to
 
 Santiago.
 
 She appears to suggest, therefore, that if one of the members of the majority in
 
 Santiago
 
 had come
 to the realization that
 
 Santiago
 
 was clearly wrong, a majority of the panel in the present case would be justified in overruling
 
 Santiago.
 
 First, if that notion does not create the appearance that the personally held beliefs of individual justices govern the outcome of the present appeal, I do not know what would. Second, the Chief Justice does not give her own vote, or the votes of the other two original dissenting justices, sufficient weight. By my tally, those votes also totaled three. Finally, if the notion advanced by the Chief Justice-that an opinion should not be overruled because the original majority continued to believe the case was rightly decided-held any weight,
 
 Plessy v. Ferguson,
 

 163 U.S. 537
 
 ,
 
 16 S.Ct. 1138
 
 ,
 
 41 L.Ed. 256
 
 (1896), overruled by
 
 Brown v. Board of Education,
 

 347 U.S. 483
 
 , 494-95,
 
 74 S.Ct. 686
 
 ,
 
 98 L.Ed. 873
 
 (1954), would still be good law.
 

 II
 

 STARE DECISIS PRINCIPLES APPLIED TO A DECISION THAT FLOUTED STARE DECISIS
 

 This court has stated that "[one] well recognized exception to stare decisis under which a court will examine and overrule a prior decision ... [is when that prior decision] is clearly wrong." (Internal quotation marks omitted.)
 
 Conway v. Wilton,
 
 supra, 238 Conn. at 660,
 
 680 A.2d 242
 
 . The exception to the doctrine of stare decisis for decisions that are "clearly wrong" is perhaps the oldest and most well established, dating back to William Blackstone, who explained: "[I]t is an established rule to abide by former precedents, where the same points come again in litigation.... Yet this rule admits of exception, where the former determination is
 
 most evidently contrary to reason;
 
 much more if it be contrary to the divine law.... The doctrine of the law then is this: that precedents and rules must be followed,
 
 unless flatly absurd
 
 or unjust: for though their reason be not obvious at first view, yet we owe such a deference to former times as not to suppose they acted wholly without consideration." (Emphasis added.) 1 W. Blackstone, Commentaries on the Laws of England (1775) pp. 69-70.
 

 Contrary to the position of the Chief Justice, the United States Supreme Court has held that when a recently decided case has ignored and contravened existing precedent, the doctrine of stare decisis
 
 requires
 
 that the decision be overruled. As explained by D. Arthur Kelsey, now a justice of the Supreme Court of Virginia, when "a court overrules a more recent case that, itself, violated stare decisis and thus represented a divergence from settled precedent ... the court
 does not flout stare decisis by overruling the anomalous case. Rather, it 'restore[s]' the prior 'fabric of [the] law' that the anomalous case departed from.
 
 Adarand Constructors, Inc. v. Pena,
 
 [supra,
 
 515 U.S. at 234
 
 ,
 
 115 S.Ct. 2097
 
 ]. Thus, in
 
 Adarand Constructors, Inc.,
 
 the [c]ourt overruled its recent opinion in [
 
 Metro Broadcasting, Inc. v. Federal Communications Commission,
 

 497 U.S. 547
 
 ,
 
 110 S.Ct. 2997
 
 ,
 
 111 L.Ed.2d 445
 
 (1990) ], stating: '
 
 Metro Broadcasting
 
 [
 
 Inc.
 
 ] itself departed from our prior cases-and did so quite recently. By refusing to follow
 
 Metro Broadcasting
 
 [
 
 Inc.
 
 ], then, we do not depart from the fabric of the law; we restore it.' " D. Kelsey, "The Architecture of Judicial Power: Appellate Review and Stare Decisis," 45 Judges' J., p. 13 n. 29 (Spring 2006).
 

 I observe that there were significant panel changes in the five years that passed between
 
 Metro Broadcasting, Inc.,
 
 and
 
 Adarand Constructors, Inc.
 
 The majority in
 
 Metro Broadcasting, Inc.,
 
 was comprised of Justices Brennan, White, Marshall, Blackmun and Stevens.
 
 Metro Broadcasting, Inc. v. Federal Communications
 

 Commission,
 
 supra, 497 U.S. at 550,
 
 110 S.Ct. 2997
 
 . The dissenters were Chief Justice Rehnquist, and Justices O'Connor, Scalia and Kennedy.
 
 Id.
 
 When the court overruled
 
 Metro Broadcasting, Inc.,
 
 in
 
 Adarand Constructors, Inc.,
 
 none of the original panel members changed their positions, but only Justice Stevens remained of the original majority.
 
 Adarand Constructors, Inc. v. Pena,
 
 supra,
 
 515 U.S. at 202-203
 
 ,
 
 115 S.Ct. 2097
 
 . Writing for the majority in
 
 Adarand Constructors, Inc.
 
 , Justice O'Connor distinguished this context-when the court considers overruling a recent decision that contravened well established precedent-from the context presented in
 
 Planned Parenthood of Southeastern Pennsylvania v. Casey,
 

 505 U.S. 833
 
 , 844, 864,
 
 112 S.Ct. 2791
 
 ,
 
 120 L.Ed.2d 674
 
 (1992), in which the court considered whether to overrule
 
 Roe v. Wade,
 

 410 U.S. 113
 
 ,
 
 93 S.Ct. 705
 
 ,
 
 35 L.Ed.2d 147
 
 (1973).
 
 Adarand Constructors, Inc. v. Pena,
 
 supra, at 233,
 
 115 S.Ct. 2097
 
 . When
 
 Casey
 
 was decided,
 
 Roe
 
 had become "integrated into the fabric of law."
 
 Id., at 234
 
 ,
 
 115 S.Ct. 2097
 
 . By contrast,
 
 Metro Broadcasting, Inc.
 
 , created a tear in that fabric by violating the principle of stare decisis; the doctrine therefore required that the damage be controlled by overruling the anomalous decision as soon as possible.
 
 Id., at 233-34
 
 ,
 
 115 S.Ct. 2097
 
 .
 

 The United States Supreme Court relied on the very same principle in
 
 United States v. Dixon,
 

 509 U.S. 688
 
 , 704,
 
 113 S.Ct. 2849
 
 ,
 
 125 L.Ed.2d 556
 
 (1993), in which it overruled its decision in
 
 Grady v. Corbin,
 

 495 U.S. 508
 
 ,
 
 110 S.Ct. 2084
 
 ,
 
 109 L.Ed.2d 548
 
 (1990), following a panel change. The court in
 
 Dixon
 
 explained that "
 
 Grady
 
 contradicted an unbroken line of decisions, contained less than accurate historical analysis, and has produced confusion...." (Internal quotation marks omitted.)
 
 United States v. Dixon,
 
 supra, at 711,
 
 113 S.Ct. 2849
 
 . Letting that decision stand, therefore, would "mock stare decisis." Id., at 712,
 
 113 S.Ct. 2849
 
 ; see D. Kelsey, supra, at 45 Judges' J., p. 13 n. 29.
 

 That is precisely the context in the present case. The Chief Justice detailed the manner in which the majority in
 
 Santiago
 
 cast aside a vast body of existing precedent, simply because the majority of the panel in that case held a contrary view, in complete contravention to applicable precedent and with flagrant disrespect for the principle of stare decisis.
 
 State v. Santiago,
 
 supra,
 
 318 Conn. at 238-39
 
 ,
 
 122 A.3d 1
 
 (
 
 Rogers, C.J.,
 
 dissenting). She observed that essential to the majority's analysis was its position that "this court's previous holdings that the due process provisions of the state constitution do not bar the imposition of the death penalty for the most heinous murders are now questionable...."
 
 Id., at 38
 
 ,
 
 122 A.3d 1
 
 (
 
 Rogers, C.J.,
 
 dissenting). She then criticized the majority, not only for its lack of respect for precedent, but also for its lack of intellectual honesty. She pointed out that the majority-unwilling to openly acknowledge the fact that it was overruling dozens of decisions, which repeatedly had upheld the constitutionality of the death
 penalty, solely because the majority would have held a different view-"carefully avoid[ed] suggesting ... [that those decisions] were wrongly decided." (Citation omitted.)
 
 Id.,
 
 at 238 n. 5,
 
 122 A.3d 1
 
 .
 

 In fact, the Chief Justice's dissenting opinion in
 
 Santiago
 
 makes clear that the majority decision in that case was driven by naked judicial activism, in contravention to the existing law of this state. She explained: "[B]ecause there is no legitimate legal basis for finding the death penalty unconstitutional under either the federal or the state constitution, I can only conclude that the majority has improperly decided that the death penalty must be
 struck down because it offends the majority's subjective sense of morality." Id., at 276-77,
 
 122 A.3d 1
 
 . It was a classic example of a court giving no effect or even consideration to the principle of stare decisis, and represented a drastic departure from our death penalty jurisprudence. Inevitably, such decisions are, as the Chief Justice expressed eloquently, "based on a house of cards, falling under the slightest breath of scrutiny." Id., at 233,
 
 122 A.3d 1
 
 . In other words, such decisions inevitably are clearly wrong and destroy the fabric of the law. Stare decisis requires that such decisions be overruled.
 

 In the present case, accordingly, the question is not whether the court should overrule
 
 Santiago because of
 
 a panel change. The question that the Chief Justice should be asking is whether stare decisis principles support the conclusion that a panel change
 
 prevents
 
 this court from being able to overrule a clearly wrong, recently decided case that constitutes an abrupt departure from well established precedent. And the clear answer to that question is no; stare decisis requires that the fabric of the law be restored by overruling the anomalous decision.
 

 The Chief Justice cannot point to a single case to support the proposition that a panel change prevents
 the court from overruling clearly wrong precedent, because none exists. My research has revealed that all of this court's decisions overruling prior precedent have happened
 
 following
 
 a panel change. During her tenure, for instance, my research also has revealed that this court has overruled its prior precedent on at least
 
 twenty-five occasions.
 
 In every single one of those cases, the panel that overruled the prior precedent differed from the panel that had decided the original case. See
 
 State v. Wright,
 

 320 Conn. 781
 
 , 810,
 
 135 A.3d 1
 
 (2016) (overruling in part
 
 State v. DeJesus,
 

 270 Conn. 826
 
 ,
 
 856 A.2d 345
 
 [ (2004) ] );
 
 Arras v. Regional School District No. 14,
 

 319 Conn. 245
 
 , 268-69 n. 24,
 
 125 A.3d 172
 
 (2015) (overruling
 
 Pollard v. Norwalk,
 

 108 Conn. 145
 
 ,
 
 142 A. 807
 
 [ (1928) ], "to the extent that
 
 Pollard
 
 supports the dissent's position" in
 
 Arras,
 
 on basis that if dissent's reading of
 
 Pollard
 
 were correct,
 
 Pollard
 
 would be inconsistent with
 
 Bortner v. Woodbridge,
 

 250 Conn. 241
 
 ,
 
 736 A.2d 104
 
 [ (1999) ], and
 
 Sadlowski v. Manchester,
 

 206 Conn. 579
 
 ,
 
 538 A.2d 1052
 
 [1988] );
 
 Campos v. Coleman,
 

 319 Conn. 36
 
 , 57,
 
 123 A.3d 854
 
 (2015) (overruling
 
 Mendillo v. Board of Education,
 

 246 Conn. 456
 
 ,
 
 717 A.2d 1177
 
 [ (1998) ] );
 
 State v. Moreno-Hernandez,
 

 317 Conn. 292
 
 , 308,
 
 118 A.3d 26
 
 (2015) (overruling in part
 
 State v. Gonzalez,
 

 222 Conn. 718
 
 ,
 
 609 A.2d 1003
 
 [ (1992) ] );
 
 Haynes v. Middletown,
 

 314 Conn. 303
 
 , 323,
 
 101 A.3d 249
 
 (2014) (overruling in part both
 
 Purzycki v. Fairfield,
 

 244 Conn. 101
 
 ,
 
 708 A.2d 937
 
 [ (1998) ], and
 
 Burns v. Board of Education,
 

 228 Conn. 640
 
 ,
 
 638 A.2d 1
 
 [ (1994) ] );
 
 State v. Artis,
 

 314 Conn. 131
 
 , 156,
 
 101 A.3d 915
 
 (2014) (overruling
 
 State v. Gordon,
 

 185 Conn. 402
 
 ,
 
 441 A.2d 119
 
 [ (1981) ], cert. denied,
 
 455 U.S. 989
 
 ,
 
 102 S.Ct. 1612
 
 ,
 
 71 L.Ed.2d 848
 
 [ (1982) ] );
 
 State v. Elson,
 

 311 Conn. 726
 
 , 746-48, 748 n. 14, 754,
 
 91 A.3d 862
 
 (2014) (overruling in part
 
 In re Jan Carlos D.,
 

 297 Conn. 16
 
 ,
 
 997 A.2d 471
 
 [ (2010) ],
 
 State v. Cutler,
 

 293 Conn. 303
 
 ,
 
 977 A.2d 209
 
 [( 2009) ],
 
 In re Melody L.,
 

 290 Conn. 131
 
 ,
 
 962 A.2d 81
 
 [ (2009) ],
 
 Johnson v. Commissioner of Correction,
 

 288 Conn. 53
 
 ,
 
 951 A.2d 520
 
 [ (2008) ],
 
 State v. McKenzie-Adams,
 

 281 Conn. 486
 
 ,
 
 915 A.2d 822
 
 , cert. denied,
 
 552 U.S. 888
 
 ,
 
 128 S.Ct. 248
 
 ,
 
 169 L.Ed.2d 148
 
 [ (2007) ],
 
 State v. Commins,
 

 276 Conn. 503
 
 ,
 
 886 A.2d 824
 
 [ (2005) ],
 
 Lebron v. Commissioner of Correction,
 

 274 Conn. 507
 
 ,
 
 876 A.2d 1178
 
 [ (2005) ], and
 
 State v. Ramos,
 

 261 Conn. 156
 
 ,
 
 801 A.2d 788
 
 [ (2002) ] );
 
 Ulbrich v. Groth,
 

 310 Conn. 375
 
 , 409,
 
 78 A.3d 76
 
 (2013) (overruling in part
 
 Flagg Energy Development
 

 Corp. v. General Motors Corp.,
 

 244 Conn. 126
 
 ,
 
 709 A.2d 1075
 
 [ (1998) ] );
 
 State v. Moulton,
 

 310 Conn. 337
 
 , 362 n. 23, 363,
 
 78 A.3d 55
 
 (2013) (overruling "prior precedent to the contrary" of court's conclusion that "[General Statutes] § 53a-183 [a] proscribes harassing and alarming speech as well as conduct");
 
 State v. Polanco,
 

 308 Conn. 242
 
 , 245, 261,
 
 61 A.3d 1084
 
 (2013) (overruling in part
 
 State v. Chicano,
 

 216 Conn. 699
 
 ,
 
 584 A.2d 425
 
 [ (1990) ], cert. denied,
 
 501 U.S. 1254
 
 ,
 
 111 S.Ct. 2898
 
 ,
 
 115 L.Ed.2d 1062
 
 [ (1991) ] );
 
 State v. Sanchez,
 

 308 Conn. 64
 
 , 80,
 
 60 A.3d 271
 
 (2013) (overruling in part
 
 Finley v. Aetna Life & Casualty Co.,
 

 202 Conn. 190
 
 ,
 
 520 A.2d 208
 
 [ (1987) ], overruled in part on other grounds by
 
 Curry v. Burns,
 

 225 Conn. 782
 
 , 786,
 
 626 A.2d 719
 
 [ (1993) ] );
 
 State v. Guilbert,
 

 306 Conn. 218
 
 , 253,
 
 49 A.3d 705
 
 (2012) (overruling in part
 
 State v. McClendon,
 

 248 Conn. 572
 
 ,
 
 730 A.2d 1107
 
 [ (1999) ], and
 
 State v. Kemp,
 

 199 Conn. 473
 
 ,
 
 507 A.2d 1387
 
 [ (1986) ] );
 
 State v. Paige,
 

 304 Conn. 426
 
 , 446,
 
 40 A.3d 279
 
 (2012) (overruling in part
 
 State v. Greenberg,
 

 92 Conn. 657
 
 ,
 
 103 A. 897
 
 [ (1918) ] );
 
 Gross v. Rell,
 

 304 Conn. 234
 
 , 270-71,
 
 40 A.3d 240
 
 (2012) (overruling in part
 
 Lesnewski v. Redvers,
 

 276 Conn. 526
 
 ,
 
 886 A.2d 1207
 
 [ (2005) ] );
 
 Arrowood Indemnity Co. v. King,
 

 304 Conn. 179
 
 , 201,
 
 39 A.3d 712
 
 (2012) (overruling in part
 
 Aetna Casualty & Surety Co. v. Murphy,
 

 206 Conn. 409
 
 ,
 
 538 A.2d 219
 
 [ (1988) ] );
 
 State v. Payne,
 

 303 Conn. 538
 
 , 541-42, 564,
 
 34 A.3d 370
 
 (2012) (overruling
 
 State v. King,
 

 187 Conn. 292
 
 ,
 
 445 A.2d 901
 
 [ (1982) ], "and
 its progeny," and overruling in part
 
 State v. Tomas D.,
 

 296 Conn. 476
 
 ,
 
 995 A.2d 583
 
 [ (2010) ] );
 
 State v. Kitchens,
 

 299 Conn. 447
 
 , 472-73,
 
 10 A.3d 942
 
 (2011) (overruling in part
 
 State v. Ebron,
 

 292 Conn. 656
 
 ,
 
 975 A.2d 17
 
 [ (2009) ] );
 
 Bysiewicz v. Dinardo,
 

 298 Conn. 748
 
 , 778-79 n. 26,
 
 6 A.3d 726
 
 (2010) (overruling
 
 In re
 

 Application of Slade,
 

 169 Conn. 677
 
 ,
 
 363 A.2d 1099
 
 [ (1975) ] );
 
 State v. Connor,
 

 292 Conn. 483
 
 , 528 n. 29,
 
 973 A.2d 627
 
 (2009) (overruling in part
 
 State v. Day,
 

 233 Conn. 813
 
 ,
 
 661 A.2d 539
 
 [ (1995) ] );
 
 St. Joseph's Living Center, Inc. v. Windham,
 

 290 Conn. 695
 
 , 729 n. 37,
 
 966 A.2d 188
 
 (2009) (overruling
 
 Fanny J. Crosby Memorial, Inc. v. Bridgeport,
 

 262 Conn. 213
 
 ,
 
 811 A.2d 1277
 
 [ (2002) ], and
 
 United Church of Christ v. West Hartford,
 

 206 Conn. 711
 
 ,
 
 539 A.2d 573
 
 [ (1988) ], to extent that those cases were inconsistent);
 
 State v. DeJesus,
 

 288 Conn. 418
 
 , 437,
 
 953 A.2d 45
 
 (2008)
 
 [4]
 
 (overruling in part
 
 State v. Sanseverino,
 

 287 Conn. 608
 
 ,
 
 949 A.2d 1156
 
 [ (2008) ] [
 
 Sanseverino I
 
 ], superseded in part by
 
 State v. Sanseverino,
 

 291 Conn. 574
 
 ,
 
 969 A.2d 710
 
 [ (2009) ] [
 
 Sanseverino II
 
 ] );
 
 State v. Salamon,
 

 287 Conn. 509
 
 , 513, 542,
 
 949 A.2d 1092
 
 (2008) (overruling entire line of cases interpreting kidnapping statutes as allowing conviction for kidnapping even when restraint involved was merely incidental to commission of another offense, most recently stated in
 
 State v. Luurtsema,
 

 262 Conn. 179
 
 ,
 
 811 A.2d 223
 
 [ (2002) ] );
 
 Jaiguay v. Vasquez,
 

 287 Conn. 323
 
 , 348,
 
 948 A.2d 955
 
 (2008) (overruling in part
 
 Johnson v. Atkinson,
 

 283 Conn. 243
 
 ,
 
 926 A.2d 656
 
 [ (2007) ] );
 
 State v. Grant,
 

 286 Conn. 499
 
 , 535,
 
 944 A.2d 947
 
 (overruling in part
 
 State v. Whipper,
 

 258 Conn. 229
 
 ,
 
 780 A.2d 53
 
 [ (2001) ] ), cert. denied,
 
 555 U.S. 916
 
 ,
 
 129 S.Ct. 271
 
 ,
 
 172 L.Ed.2d 200
 
 (2008) ;
 
 Gibbons v. Historic District Commission,
 

 285 Conn. 755
 
 , 771,
 
 941 A.2d 917
 
 (2008) (overruling in part
 
 Stankiewicz
 

 v. Zoning Board of Appeals
 
 ,
 
 211 Conn. 76
 
 ,
 
 556 A.2d 1024
 
 [ (1989) ] ).
 

 The Chief Justice presided over many of the appeals in which this court overruled
 prior precedent. Accordingly, this court's existing practices in adhering-or not adhering-to the stare decisis principles that the Chief Justice currently invokes are relevant in evaluating the persuasiveness of her claim that the doctrine prevents this court from overruling
 
 Santiago.
 
 I note that many of this court's recent decisions overruling prior precedent include no discussion whatsoever of the doctrine of stare decisis. See, e.g.,
 
 Haynes v. Middletown,
 
 supra, 314 Conn. at 323,
 
 101 A.3d 249
 
 (overruling in part both
 
 Purzycki v. Fairfield,
 
 supra, 244 Conn. at 101,
 
 708 A.2d 937
 
 , and
 
 Burns v. Board of Education,
 
 supra,
 
 228 Conn. at 640
 
 ,
 
 638 A.2d 1
 
 , with no mention of stare decisis or underlying principles);
 
 State v. Sanchez,
 
 supra, 308 Conn. at 78,
 
 60 A.3d 271
 
 (overruling in part
 
 Finley v. Aetna Life & Casualty Co.,
 
 supra,
 
 202 Conn. at 190
 
 ,
 
 520 A.2d 208
 
 , with no mention of stare decisis or underlying principles);
 
 State v. Paige,
 
 supra, 304 Conn. at 446,
 
 40 A.3d 279
 
 (overruling in part
 
 State v. Greenberg,
 
 supra,
 
 92 Conn. at 657
 
 ,
 
 103 A. 897
 
 , with no mention of stare decisis or underlying principles). The Chief Justice's stated concern in her concurring opinion in this case, that overruling
 
 Santiago
 
 would raise questions "about the court's integrity and the rule of law in the state of Connecticut," cannot be reconciled with the number of times this court has overturned its prior decisions without even considering whether doing so would be consistent with the doctrine.
 

 These recent decisions also call into question the assertion of the Chief Justice that stare decisis must be adhered to in the present case because "neither the factual underpinnings of the prior decision nor the law has changed...." She contends that one of these changes is necessary before a court may overrule a decision. Presumably, because she recognizes no exception for clearly wrong decisions despite its well
 established roots in our law, and because she obviously believes that
 
 Santiago
 
 was clearly wrong; see
 
 State v. Santiago,
 
 supra,
 
 318 Conn. at 231-341
 
 ,
 
 122 A.3d 1
 
 (
 
 Rogers, C.J.,
 
 dissenting); she takes the position that even when a decision is clearly wrong, it must be accorded stare decisis effect unless one of these two conditions is present. She claims that in the absence of one or both of those two conditions, the decision to overrule prior precedent is based merely on "a present doctrinal disposition to come out differently from [the prior decision]."
 
 Planned Parenthood of Southeastern Pennsylvania v. Casey,
 

 supra,
 

 505 U.S. at 864
 
 ,
 
 112 S.Ct. 2791
 
 .
 

 In a case that was decided mere months ago, however, the Chief Justice joined the majority in overruling prior precedent, despite the absence of either of these two conditions. And in doing so, the court recognized a new cause of action, hardly a small change in the law. In
 
 Campos v. Coleman,
 
 supra, 319 Conn. at 57,
 
 123 A.3d 854
 
 , this court overruled
 
 Mendillo v. Board of Education,
 
 supra,
 
 246 Conn. at 456, 461, 477-96
 
 ,
 
 717 A.2d 1177
 
 , in which the court had declined, based on an exhaustive analysis of the relevant policy principles and applicable precedent, to recognize a derivative cause of action for loss of consortium by a minor child. The justification provided by the court in
 
 Campos
 
 for overruling
 
 Mendillo,
 
 which had been decided by an en banc panel before the court adopted that practice for all cases, is illuminating: "Upon reconsideration of the relevant considerations, including the five factors that this court found determinative in
 
 Mendillo,
 
 we now agree with the concurring and dissenting opinion in
 
 Mendillo
 
 that the public policy factors favoring recognition of a cause of action for loss of parental consortium outweigh those factors disfavoring recognition."
 
 Campos v. Coleman,
 
 supra, at 43,
 
 123 A.3d 854
 
 . The opinion then proceeded to consider each of those factors and explain why the present
 panel now "disagree [d]"; id., at 45,
 
 123 A.3d 854
 
 ; with the evaluation conducted by the
 panel in
 
 Mendillo
 
 of each of those factors. Id., at 44-57,
 
 123 A.3d 854
 
 . In other words, the panel in
 
 Campos
 
 simply disagreed with the conclusion arrived at by the panel in
 
 Mendillo,
 
 so
 
 Mendillo
 
 was overruled. Nothing in the factual underpinnings or the law had changed in the more than seventeen years since
 
 Mendillo
 
 was decided. The court in
 
 Campos
 
 relied on many of the identical authorities on which the court in
 
 Mendillo
 
 had relied, but the court in
 
 Campos
 
 arrived at a different conclusion.
 

 One would expect, considering the Chief Justice's claim that the court is bound by the doctrine of stare decisis in the present case, that she would have expressed similar concerns regarding the risk that the court might appear to be deciding cases on the basis of the personal moral beliefs of individual justices, and that
 
 Campos
 
 would include an extensive and considered discussion of why stare decisis should not apply to
 
 Mendillo.
 
 Not so. Not only did
 
 Campos
 
 restrict its passing reference to the doctrine of stare decisis to a brief footnote, but it also misstated one of the basic principles underlying the doctrine.
 
 Id.,
 
 at 57 n. 16,
 
 123 A.3d 854
 
 . Specifically, as I have explained in this dissenting opinion, the exception to the doctrine of stare decisis for clearly wrong decisions is well established. That exception, however, is quite narrow, and does not apply to a decision when a current panel concludes merely that, although the original decision was "wrong," reasonable jurists could disagree. We have therefore limited the application of the "clearly wrong" exception to stare decisis to those instances when overruling prior precedent is compelled by "the
 
 most cogent
 
 reasons and
 
 inescapable
 
 logic...." (Emphasis added; internal quotation marks omitted.)
 
 Conway v. Wilton,
 
 supra, 238 Conn. at 660-61,
 
 680 A.2d 242
 
 . The court in
 
 Campos,
 
 however, merely made the conclusory statement that its decision to overrule
 
 Mendillo
 
 was justified because "logic dictate[d] such a result."
 

 Campos v. Coleman,
 
 supra, 319 Conn. at 57 n. 16,
 
 123 A.3d 854
 
 . This statement significantly lowers the bar. If all that were required in order for this court to overrule prior precedent was the present panel's conclusion that "logic dictated" that result, our definition of the word "precedent" would have to change radically.
 

 Outside observers reading the
 
 Campos
 
 decision might be concerned that the
 
 sole reason
 
 for its conclusion was the
 
 composition of the panel.
 
 The Chief Justice, however, joined the majority, a position that is inconsistent with her concern in the present case to avoid the appearance of being driven by a mere doctrinal disagreement with the
 
 previous panel.
 

 The Chief Justice's decision in
 
 State v. DeJesus,
 
 supra, 288 Conn. at 418,
 
 953 A.2d 45
 
 , is particularly problematic for her, because in that case, without any hesitation, she authored an opinion that accomplished precisely what she asserts today would so threaten the rule of law and the integrity of this court. In
 
 Sanseverino I,
 
 supra, 287 Conn. at 612-13,
 
 949 A.2d 1156
 
 , decided less than two months before
 
 DeJesus,
 
 this court applied
 
 State v. Salamon,
 
 supra, 287 Conn. at 509,
 
 949 A.2d 1092
 
 , to reverse the defendant's conviction for kidnapping. In
 
 Salamon,
 
 this court overruled a long line of cases that had held that a conviction for kidnapping would lie even when "the restraint involved ... [was] merely incidental to the commission of another offense perpetrated against the victim by the accused." Id., at 513,
 
 949 A.2d 1092
 
 . The defendant in
 
 Sanseverino I
 
 had been convicted of both kidnapping and sexual assault.
 
 Sanseverino I,
 
 supra, at 611-12,
 
 949 A.2d 1156
 
 . The majority in
 
 Sanseverino I,
 
 supra, at 624,
 
 949 A.2d 1156
 
 , concluded that, under the new rule,
 which required that the state prove that the restraint involved was more than merely incidental to and necessary for the commission of the sexual assault, "no reasonable jury could have found the defendant guilty of kidnapping in the first degree on the basis of the evidence that the state proffered at trial." Accordingly, the proper
 remedy, the court concluded, was not a retrial on the kidnapping charge, but an outright acquittal. Id., at 626,
 
 949 A.2d 1156
 
 . Justice Zarella dissented, arguing that the majority decision improperly had evaluated the sufficiency of the state's evidence presented at trial on the basis of the new rule. Id., at 654,
 
 949 A.2d 1156
 
 . Justice Zarella observed: "The majority may be correct that, on the basis of the facts presented at the defendant's trial, the state did not demonstrate that the defendant perpetrated a restraint of the victim that has legal significance independent of the sexual assault. The state, however, had no knowledge when presenting its case to the jury that it was necessary to make such a showing."
 
 Id.
 
 (
 
 Zarella, J.,
 
 dissenting).
 

 The Chief Justice, who had joined the majority in
 
 Sanseverino I,
 
 authored
 
 State v. DeJesus,
 
 supra, 288 Conn. at 437,
 
 953 A.2d 45
 
 , which, with the
 
 addition of two new panel members,
 
 overruled
 
 Sanseverino I.
 
 In
 
 DeJesus,
 
 the Chief Justice relied on the very same principles-in fact, the very same case law-that she and the other members of the majority in
 
 Sanseverino I
 
 had found unpersuasive less than two months earlier. Compare
 
 Sanseverino I,
 
 supra, 287 Conn. at 648-64,
 
 949 A.2d 1156
 
 (
 
 Zarella, J.,
 
 dissenting), with
 
 State v. DeJesus,
 
 supra, 288 Conn. at 434-39,
 
 953 A.2d 45
 
 . And she did so notwithstanding the objections of the dissent, which argued that the decision in
 
 DeJesus
 
 evinced a "lack of respect for the principle of stare decisis...."
 
 State v. DeJesus,
 
 supra, 288 Conn. at 529,
 
 953 A.2d 45
 
 (
 
 Katz, J.,
 
 dissenting). Specifically, the dissent in
 
 DeJesus
 
 levied an uncannily familiar accusation against the majority, stating that "[t]he majority's decision to overrule such
 
 recent
 
 precedent strikes at the very heart of [stare decisis]." (Emphasis added.) Id., at 530,
 
 953 A.2d 45
 
 (
 
 Katz, J.,
 
 dissenting).
 

 Writing for the majority in
 
 DeJesus,
 
 the Chief Justice quickly dismissed the dissenting opinion's arguments, voicing no concerns whatsoever that either the
 
 subse
 

 quent
 

 panel
 
 change or the quick nature of the about face presented any impediment to overruling
 
 Sanseverino I.
 

 State v. DeJesus,
 
 supra, 288 Conn. at 437-38 n. 14,
 
 953 A.2d 45
 
 . This is particularly noteworthy for several reasons. First, as I have observed, the dissent expressly pointed out the fact that
 
 DeJesus
 
 was released at a whiplash-inducing speed after
 
 Sanseverino I,
 
 which was controlling precedent as to the appropriate remedy for less than two months before the court changed its mind. Id., at 529,
 
 953 A.2d 45
 
 (
 
 Katz, J.,
 
 dissenting). Second, the sole justification on which the majority in
 
 DeJesus
 
 relied for its decision to overrule
 
 Sanseverino I
 
 was that the rule announced was
 
 clearly
 
 "
 
 wrongly decided.
 
 " (Emphasis added.)
 
 Id.,
 
 at 437 n. 14,
 
 953 A.2d 45
 
 . The opposite conclusion, the majority explained, was compelled by the most "inescapable logic...."
 
 Id.
 
 This basis, that
 
 Sanseverino I
 
 was not merely wrong, but indisputably so, is the very same basis that the Chief Justice now asserts is somehow insufficient to overrule
 
 Santiago,
 
 despite her very public and very obvious belief that
 
 Santiago
 
 is clearly wrong. Lastly, I observe that because so little time passed between the publication of
 
 Sanseverino I
 
 and
 
 DeJesus,
 
 absolutely nothing had changed between the two decisions. This is particularly ironic, given the Chief Justice's insistence in the present case that in order for this court to overrule prior precedent, there must have been some subsequent change in the facts or the law, and
 that the conclusion that a decision was clearly wrong, on its own, is insufficient to justify a departure from stare decisis. One wonders what the Chief Justice might have responded in
 
 DeJesus,
 
 had the dissent pointed out, quite accurately, that "the only change that has occurred [since
 
 Sanseverino I
 
 was decided] is a change in the makeup of this court...."
 

 Do not misunderstand me to suggest that
 
 State v. DeJesus,
 
 supra, 288 Conn. at 418,
 
 953 A.2d 45
 
 , was wrongly decided. To the contrary,
 
 DeJesus
 
 is perfectly consistent with
 the doctrine of stare decisis, because
 
 Sanseverino I,
 
 supra, 287 Conn. at 608,
 
 949 A.2d 1156
 
 , had ignored prior precedent. The panel in
 
 DeJesus,
 
 therefore, was required by the doctrine of stare decisis to overrule the portion of
 
 Sanseverino I
 
 that contravened well established precedent, regardless of how recently
 
 Sanseverino I
 
 had been decided, and regardless of whether there was a panel change.
 
 DeJesus
 
 repaired the fabric of the law. And
 
 DeJesus
 
 did so as quickly as possible, before the errant decision could do damage. That is precisely what we are asked to do in the present case.
 

 The position of the Chief Justice, that when there has been a panel change, stare decisis precludes the court from overturning a recent, clearly wrong decision that flouted established precedent, conflicts with a fundamental principle underlying the doctrine of stare decisis, namely, that the doctrine, although grounded in stability and consistency,
 
 cannot
 
 be rigid. Otherwise, consistency and stability would require the court to follow precedent regardless of how wrong it may be. See
 
 Conway v. Wilton,
 
 supra, 238 Conn. at 660,
 
 680 A.2d 242
 
 ("Stare decisis is not an inexorable command.... [A]lthough [s]tare decisis is a doctrine developed by courts to accomplish the requisite element of stability in court-made law, [it] is not an absolute impediment to change.... [S]tability should not be confused with perpetuity. If law is to have a current relevance, courts must have and exert the capacity to change a rule of law when reason so requires." [Citations omitted; internal quotation marks omitted.] ). As this court has stated on many occasions, it is more important to be right than to be consistent.
 
 Id.
 

 The two "rules" that the Chief Justice focuses on in her concurring opinion in the present case are: (1) this court cannot overrule a decision following a panel change; and (2) this court cannot overrule a recently decided case. As to the first supposed rule, she points
 to no instance in which this court overruled prior precedent, where there had not been an
 
 intervening panel change.
 
 She also fails to cite to a single decision by this court declining to overrule a prior precedent on the basis that it was too recently decided. Assuming, however, for purposes of discussion, that these two rules bar the court from overruling prior precedent, her rigid application of these principles, if carried out in the manner that they suggest is appropriate, would guarantee that a clearly wrong decision would stand uncorrected.
 

 An excellent illustration of this principle is this court's decision in
 
 Tileston v. Ullman,
 

 129 Conn. 84
 
 , 86,
 
 26 A.2d 582
 
 (1942), appeal dismissed,
 
 318 U.S. 44
 
 , 46,
 
 63 S.Ct. 493
 
 ,
 
 87 L.Ed. 603
 
 (1943), which declined to overrule
 
 State v. Nelson,
 

 126 Conn. 412
 
 ,
 
 11 A.2d 856
 
 (1940), based in part on the principle that "a change in personnel of the court affords no ground for reopening a question which has been authoritatively settled." Just as in the present case, there had been a panel change between the two decisions; the panels differed by one member because Justice Hinman, who had been on the panel in
 
 Nelson,
 
 had retired. In
 
 Nelson,
 
 the court had rejected a challenge to General Statutes (1930 Rev.)
 

 §§ 6246 and 6562, which together, as construed by the court, made it a criminal offense for a physician to prescribe contraceptives to a married woman, even when "the general health and well-being of the patient require[d] it."
 
 Tileston v. Ullman,
 
 supra, at 85,
 
 26 A.2d 582
 
 . The court in
 
 Nelson
 
 expressly left open the question of whether an exception should be read into the statutes when a physician has concluded that pregnancy would jeopardize the life of the woman, which the court acknowledged was a commonly recognized exception in abortion statutes at the time.
 
 State v. Nelson,
 
 supra, at 418,
 
 11 A.2d 856
 
 ;
 
 Tileston v. Ullman,
 
 supra, at 85,
 
 26 A.2d 582
 
 .
 

 The plaintiff in
 
 Tileston
 
 was a licensed physician who sought a declaratory judgment that General Statutes (1930 Rev.) §§ 6246 and 6562 allowed for an exception when a physician had concluded that pregnancy would place a woman's life in danger. Although this was precisely the issue that had been left unresolved by
 
 Nelson;
 

 State v. Nelson,
 
 supra,
 
 126 Conn. at 418
 
 ,
 
 11 A.2d 856
 
 ; the court in
 
 Tileston
 
 characterized the claim as one that would require it to overrule
 
 Nelson,
 
 and declined to do so, in part because the panel had changed.
 
 Tileston v. Ullman,
 
 supra,
 
 129 Conn. at 86
 
 ,
 
 26 A.2d 582
 
 .
 

 In
 
 Tileston,
 
 the court's reliance on the panel change obviated any need to reexamine the problematic public policy principles on which
 
 Nelson
 
 had rested. Specifically, in
 
 Nelson,
 
 the court had explained that the statutes' "plain purpose" was "to protect purity, to preserve chastity, to encourage continence and self-restraint, to defend the sanctity of the home, and thus engender ... a virile and virtuous race of men and women." (Internal quotation marks omitted.)
 
 State v. Nelson,
 
 supra,
 
 126 Conn. at 425
 
 ,
 
 11 A.2d 856
 
 . The court's choice of the word " 'virile' " is revealing, in light of its additional observation that "not all married [women] are immune from temptation or inclination to extra-marital indulgence, as to which risk of illegitimate pregnancy is a recognized deterrent deemed desirable in the interests of morality." Id., at 424,
 
 11 A.2d 856
 
 . Because the women at issue in the appeal were all married, any child born as a result of a so-called "illegitimate pregnancy" would not actually be "illegitimate"; putative father laws would prevent that. The purpose of the statutes, accordingly, was to protect the "virility" of husbands by preventing them from being made into cuckolds! It is easy to see why the panel in
 
 Nelson
 
 would deem such a public "purpose" to outweigh any concerns over women's general health.
 

 Similarly, the panel in
 
 Tileston
 
 had no difficulty balancing that noble public "purpose" against the considerably
 greater risk presented to the female patients at issue in that case-death. Indeed, for those women, the court had a perfectly legal, alternative solution: "absolute abstention."
 
 Tileston v. Ullman,
 
 supra,
 
 129 Conn. at 92
 
 ,
 
 26 A.2d 582
 
 . Writing for the majority, Justice Ells, the only new panel member, even offered a helpful observation: "Certainly [absolute abstention] is a sure remedy."
 
 Id.
 

 The decision in
 
 Tileston
 
 illustrates the dangers of the rigid application of stare decisis. The court in
 
 Tileston
 
 was able to rely in part on a panel change to justify its refusal to allow for a statutory exception that had not been dictated by prior precedent, despite the fact that the exception was commonly allowed in the much more extreme case of abortion. Id., at 85, 86,
 
 26 A.2d 582
 
 . Similarly, the Chief Justice is able to rely on the panel change in the present case to justify her refusal to overrule a decision that blatantly violated the doctrine of stare decisis.
 
 Tileston
 
 also starkly demonstrates the fallacy of concluding that this court risks the appearance
 that its decision is driven by the doctrinal disposition of the panel only when a new panel overrules prior precedent. Most importantly,
 
 Tileston
 
 highlights the principle that some decisions are so wrong that duty requires that the court overrule them. If a slightly different panel than the one in the present case had decided yesterday that physicians could be prosecuted for providing contraception to female patients, I have no doubt that the Chief Justice would voice no concerns that the rule of law or integrity of this court would be imperiled by overruling that clearly wrong decision.
 

 Of course, the best evidence that the Chief Justice improperly relies on the doctrine of stare decisis to justify her conclusion that
 
 Santiago
 
 should not be overruled is
 
 Santiago
 
 itself. That is, the overwhelming irony is that the Chief Justice relies on the doctrine of stare decisis in declining to overrule a decision that she herself recognized tramped merrily over this court's entire
 body of death penalty jurisprudence, in complete disregard of that doctrine.
 
 [5]
 
 The decision in
 
 Santiago
 
 rewrote
 history, contorted both this court's legal precedent and the legislative history of No. 12-5 of the 2012 Public Acts (P.A. 12-5), and blatantly substituted its own moral judgment for that of the people of this state. Good jurisprudence, not the present doctrinal disposition of a slightly different panel, would justify overruling such an abuse of judicial power. As the Chief Justice notes in her concurring opinion, the court's decision in
 
 Santiago
 
 "raise[d] legitimate concerns by the people we serve about the court's integrity and the rule of law in the state of Connecticut." We now have the opportunity to restore the faith of the people of this state in this court's respect for the rule of law. The doctrine of stare decisis requires that we take that opportunity.
 

 Overturning
 
 Santiago
 
 would not require justices to decide the present case according to their personal moral beliefs. The Chief Justice explained in her dissenting
 opinion in that case that
 
 Santiago
 
 was decided and governed by "the majority's subjective sense of morality";
 
 State v. Santiago,
 
 supra,
 
 318 Conn. at 277
 
 ,
 
 122 A.3d 1
 
 ; and was completely contrary to what was dictated by existing precedent and the legislative history of P.A. 12-5. Id., at 270-76,
 
 122 A.3d 1
 
 . I agree with her. Even a jurist who is deeply, morally opposed to capital punishment, however, has a duty to follow the law. I agree with the Chief Justice that the majority in
 
 Santiago
 
 ignored that duty, and resolved the appeal on the basis of their personal, moral opposition to the death penalty. Id., at 277,
 
 122 A.3d 1
 
 . Overruling that decision now, not after the decision has been "on the books" long enough to be relied on as precedent, is the best way to adhere to the principle of stare decisis and repair the damage that has been done to the rule of law. The United States Supreme Court has made clear that when a court is called upon to overrule a recent decision that has violated stare decisis, the doctrine of stare decisis requires that the prior decision be overruled. See
 
 Adarand Constructors, Inc. v. Pena,
 
 supra,
 
 515 U.S. at 233-34
 
 ,
 
 115 S.Ct. 2097
 
 . By focusing on the panel change, rather than the damage that
 
 Santiago
 
 inflicted on the rule of law, the Chief Justice loses sight of what needs to be done in the present case-the fabric of the law must be repaired. And the only way
 to do that would have been to overrule
 
 Santiago.
 

 I respectfully dissent.
 

 In their dissenting opinions, Justice Zarella and Justice Espinosa cite numerous decisions in which this court has overruled one of its decisions. Anyone who has had an opportunity to read those decisions will discover that there is no inconsistency between the position that I took in the decisions in which I joined and the position that I take in the present case. Of particular significance, I would emphasize that, in many of the cases relied upon by the dissenting justices in which this court has overruled a recent decision, at least one member of the majority on the original decision that was being overruled reconsidered and joined with the majority in the subsequent overruling decision. In contrast, in the present case, it is perfectly clear that all of the members of the majority in
 
 Santiago
 
 continue to believe in the correctness of their decision, and the
 
 only
 
 change is the replacement of Justice Norcott by Justice Robinson.
 

 With respect to Justice Espinosa's account of the panel changes that occurred prior to our decision in
 
 Santiago,
 
 suffice it to say that this court followed its standard procedures in determining which justices would sit on all phases of that case.
 

 The state, while ultimately acknowledging that the court in
 
 Ross
 
 "employed an independent analysis of the facial validity of a [capital] sentence," suggests that we did so principally to review the procedural safeguards that must be followed before the death penalty may be imposed, and not to review the constitutionality of the punishment itself. This argument ignores the fact that, in both
 
 State v. Ross,
 
 supra,
 
 230 Conn. at 245-52
 
 ,
 
 646 A.2d 1318
 
 , and
 
 State v. Rizzo,
 

 303 Conn. 71
 
 , 184-201,
 
 31 A.3d 1094
 
 (2011), cert. denied, --- U.S. ----,
 
 133 S.Ct. 133
 
 ,
 
 184 L.Ed.2d 64
 
 (2012), we purported to conduct a comprehensive analysis of precisely the question presented in
 
 Santiago
 
 and the present case, namely, whether, as a general matter, the death penalty had come to offend the state constitutional prohibition against cruel and unusual punishment, either because it fails to comport with contemporary standards of decency or because it no longer serves any legitimate penological purpose. The fact that capital punishment survived constitutional scrutiny in
 
 Ross
 
 and
 
 Rizzo
 
 but failed to do so in
 
 Santiago
 
 does not indicate that we applied a less deferential standard of review in the latter case, as the state contends. Rather, it simply reflects the fact that the legislature's prospective abolition of the death penalty in 2012 fundamentally reshaped the penological landscape and thus altered our constitutional calculation.
 

 I further note that the state's argument that our reliance on
 
 State v. Smith,
 
 5 Day (Conn.) 175 (1811), was misplaced because that decision failed to address the constitutionality of the sentence at issue proves little and less. I will return to the holdings and implications of
 
 Smith.
 
 For now, suffice it to say that one should not expect that a case decided in 1811, seven years before the adoption of this state's first formal constitution, would speak to the constitutionality of the sentence in question. Rather, to reiterate, in
 
 Santiago,
 
 we cited to pre-1818 authority such as
 
 Smith
 
 and
 
 Lung's Case,
 

 1 Conn. 428
 
 (1815), merely as evidence of the well established common-law freedoms from cruel and unusual punishment that were incorporated into the due process provisions of the 1818 constitution. This court's power of judicial review was never in question.
 

 The other cases on which the state relies are readily distinguishable or otherwise fail to support the propositions for which the state cites them. See, e.g.,
 
 State v. Lamme,
 
 supra, 216 Conn. at 183,
 
 579 A.2d 484
 
 (indicating that cases on which state relies in construing article first, § 9, are not binding precedent);
 
 State v. Davis,
 

 158 Conn. 341
 
 , 358-59,
 
 260 A.2d 587
 
 (1969) (relying on fact that five successive legislatures had declined to abolish death penalty in holding that penalty complied with
 
 federal
 
 constitution), vacated in part,
 
 408 U.S. 935
 
 ,
 
 92 S.Ct. 2856
 
 ,
 
 33 L.Ed.2d 750
 
 (1972) ;
 
 State v. Williams,
 

 157 Conn. 114
 
 , 120-21,
 
 249 A.2d 245
 
 (1968) (when sentence that ultimately was imposed was not illegal, failure of jail physician to provide certain medication prior to trial did not constitute cruel and unusual punishment), cert. denied,
 
 395 U.S. 927
 
 ,
 
 89 S.Ct. 1783
 
 ,
 
 23 L.Ed.2d 244
 
 (1969) ;
 
 Simborski v. Wheeler,
 

 121 Conn. 195
 
 , 197-98, 201,
 
 183 A. 688
 
 (1936) (challenge to form of execution was based on statutory rather than constitutional ground). Although the state suggests that the United States Supreme Court vacated
 
 Davis
 
 on other grounds, in truth, it was precisely this court's determination that legislative authorization insulated the death penalty from constitutional review that the Supreme Court rejected, in light of its decision in
 
 Furman v. Georgia,
 

 408 U.S. 238
 
 , 239-40,
 
 92 S.Ct. 2726
 
 ,
 
 33 L.Ed.2d 346
 
 (1972).
 

 Unless otherwise noted, all references to
 
 Santiago
 
 in this opinion refer to
 
 State v. Santiago,
 
 supra,
 
 318 Conn. at 1
 
 ,
 
 122 A.3d 1
 
 .
 

 I wish to explain my position that this court properly considered this constitutional issue, namely, the constitutionality of the death penalty in the wake of No. 12-5 of the 2012 Public Acts, in the first instance in
 
 Santiago,
 
 notwithstanding the fact that it was published well after I joined the court and its panel ultimately included a recently retired justice. In particular, I emphasize that I do not view the court's actions in
 
 Santiago
 
 as in any way precluding me from exercising my duty to decide this significant issue as a matter of first impression.
 

 I recognize that some concerns have been expressed about this court's decision to consider the constitutionality of the death penalty in the wake of Public Act 12-5 in the first instance in
 
 Santiago,
 
 rather than in this case, given this court's policy and practice of deciding important constitutional issues with a full and current panel of this court whenever possible. See W. Horton, "One Thought on
 
 State v. Santiago,
 
 " Horton, Shields & Knox Appellate Blog (October 28, 2015), available at http://hortonshieldsknox.com/one-thought-on-state-v-santiago (last visited May 16, 2016) ("it looks bad for a court when, notwithstanding a constitutional provision that a justice must stop holding office at age [seventy], a newly appointed justice has to sit on the sidelines for months, and in this one case years, while a justice over age [seventy] decides very important cases with which the new justice may disagree"); see also D. Klau, "Supreme Court to Rehear Arguments in Death Penalty Case," Appealingly Brief (December 1, 2015), available at http://appealinglybrief.com/2015/12/01/supreme-court-to-rehear-arguments-in-death-penalty-case (last visited May 16, 2016) (describing court's position vis-à-vis
 
 Santiago
 
 and present case as "uncomfortable").
 

 By way of background, I note that Governor Dannel P. Malloy appointed me to this court in December, 2013, to the seat on this court vacated by the mandated retirement of Justice Flemming L. Norcott, Jr. The constitutionality of the death penalty in the wake of Public Act 12-5 was argued in
 
 Santiago
 
 on April 23, 2013, approximately six months prior to Justice Norcott attaining the constitutionally mandated age of retirement. Justice Norcott then continued to participate in deliberations as a member of that panel, including consideration of the state's subsequent motions for reconsideration and to stay, in accordance with General Statutes § 51-198(c). Justice Norcott's vote to join the slender majority in
 
 Santiago
 
 ended a career on this court in which he had been a leading voice against the constitutionality of the death penalty. See, e.g.,
 
 State v. Santiago,
 

 305 Conn. 101
 
 , 307 n. 166,
 
 49 A.3d 566
 
 (2012);
 
 State v. Breton,
 

 264 Conn. 327
 
 , 446-47,
 
 824 A.2d 778
 
 (2003) (
 
 Norcott, J.,
 
 dissenting).
 

 I respectfully disagree with the concerns expressed about Justice Norcott's continued participation in
 
 Santiago,
 
 to my apparent exclusion from the opportunity to decide this issue tabula rasa. In my view, Justice Norcott's continued deliberation in
 
 Santiago
 
 pursuant to § 51-198(c) was wholly proper and appropriate under the letter and purpose of that statute, despite the fact that his participation lasted for nearly two years following my elevation to what had been his seat on this court. To allow prudential concerns about the exclusion of a newly appointed justice to disenfranchise Justice Norcott from his continued participation in
 
 Santiago
 
 nearly eight months into deliberations on that case-particularly given the magnitude of the issues considered therein-would have raised the constitutionally unsavory specter of running out a football game clock on the office of a member of this court in a case argued well before his retirement and the appointment of his successor. See
 
 Honulik v. Greenwich,
 

 293 Conn. 641
 
 , 661-62,
 
 980 A.2d 845
 
 (2009) (This court upheld the constitutionality of § 51-198[c] and noted that it relieved a retiring justice from the obligation to "arbitrarily ... cease hearing new cases at some point prior to reaching seventy, effectively cutting his or her term of office short, and without the possibility of a replacement. If a justice must cease all Supreme Court case work on the date of his seventieth birthday, then, by necessity, he is divested of the full authority and responsibility of his office many months before that date."). This is particularly so, given that the circumstances leading to the lengthy deliberation may well have been completely out of Justice Norcott's control. See id., at 662,
 
 980 A.2d 845
 
 (noting that some cases result "despite all good faith efforts," in "misjudgment as to the time required to dispose of an appeal or delay due to unforeseen difficulties").
 

 Thus, the timing of my participation in deciding this issue reflects nothing more than the following facts: (1) the constitutionality of the death penalty following the enactment of Public Act 12-5 is an issue of law common to numerous cases on this court's docket; (2) accordingly, some case had to be the first to consider the issue, with
 
 Santiago
 
 being the first ready case in line; (3) the length of the court's deliberations in
 
 Santiago
 
 were consistent with the gravity of the issue before the court and the length of the numerous opinions published in that case; and (4) once this court decided
 
 Santiago,
 
 it became necessary to resolve other death penalty cases as they became ready for consideration, with the present case being the first direct appeal in line after the conclusion of proceedings in
 
 Santiago.
 

 In dissenting in
 
 Payne,
 
 Justice Marshall described the majority's decision to distinguish the importance of stare decisis in cases "involving property and contract rights, where reliance interests are involved" from those "involving procedural and evidentiary rules," particularly when "decided by the narrowest of margins, over spirited dissents" as creating a "radical new exception to the doctrine of stare decisis," applicable to prior decisions with single vote margins. (Internal quotation marks omitted.)
 
 Payne v. Tennessee,
 

 supra,
 
 501 U.S. at 845, 851,
 
 111 S.Ct. 2597
 
 . He observed that "the continued vitality of literally scores of decisions must be understood to depend on nothing more than the proclivities of the individuals who now comprise a majority of this [c]ourt." (Emphasis omitted.)
 
 Id., at 851
 
 ,
 
 111 S.Ct. 2597
 
 . Justice Marshall eloquently stated that "the majority's debilitated conception of stare decisis would destroy the [c]ourt's very capacity to resolve authoritatively the abiding conflicts between those with power and those without. If this [c]ourt shows so little respect for its own precedents, it can hardly expect them to be treated more respectfully by the state actors whom these decisions are supposed to bind.... By signaling its willingness to give fresh consideration to any constitutional liberty recognized by a [five to four] vote 'over spirited dissen[t]' ... the majority invites state actors to renew the very policies deemed unconstitutional in the hope that this [c]ourt may now reverse course, even if it has only recently reaffirmed the constitutional liberty in question." (Citations omitted.)
 
 Id., at 853-54
 
 ,
 
 111 S.Ct. 2597
 
 . In sum, Justice Marshall stated: "Cast aside today are those condemned to face society's ultimate penalty. Tomorrow's victims may be minorities, women, or the indigent. Inevitably, this campaign to resurrect yesterday's 'spirited dissents' will squander the authority and the legitimacy of this [c]ourt as a protector of the powerless."
 
 Id., at 856
 
 ,
 
 111 S.Ct. 2597
 
 .
 

 In
 
 LaValle,
 
 the New York Court of Appeals considered the constitutionality of a statute requiring the trial judge to inform the jury that its deadlock with respect to a sentence of death or life without parole would require the judge to sentence the defendant to a lesser sentence of life imprisonment with parole eligibility after twenty to twenty-five years.
 
 People v. LaValle,
 

 supra,
 

 3 N.Y.3d at 116
 
 ,
 
 783 N.Y.S.2d 485
 
 ,
 
 817 N.E.2d 341
 
 . The court held that this statutory instruction was unconstitutionally coercive and that the court had to strike the statute subject to legislative repair because, under the state constitution, "the absence of any instruction is no better than the current instruction under our constitutional analysis," and "[l]ike the flawed deadlock instruction, the absence of an instruction would lead to death sentences that are based on speculation, as the [l]egislature apparently feared when it decided to prescribe the instruction."
 
 Id., at 128
 
 ,
 
 783 N.Y.S.2d 485
 
 ,
 
 817 N.E.2d 341
 
 .
 

 In his well researched and scholarly dissenting opinion, Justice Zarella crafts a test intended to mitigate the seemingly subjective nature of the existing stare decisis inquiry by requiring the court to engage in a multifactor balancing analysis after making a threshold determination that the precedent under attack is, for whatever reason, wrongly decided. Justice Zarella's test does not, however, accommodate for degrees of wrong, insofar as he observes that, "[i]n addition to placing too little value on precedent, the wrongness of a previous decision should not factor into the stare decisis calculus because it is difficult to quantify or measure the degree of a particular decision's wrongness," noting that "the merits determination is independent of, and has no impact on, the stare decisis analysis."
 

 I respectfully disagree with Justice Zarella's refusal to consider the relative degree of "wrong" in engaging in his stare decisis analysis. First, with no qualitative control other than the balancing of costs of maintaining versus eliminating a prior decision, it appears to be receptive to overruling precedent in a way that undercuts the salutary features with respect to promoting stability in the law. Second, this approach ironically appears to overrule certain well established principles of stare decisis, namely that: (1) the prior decision must be shown to be "
 
 clearly wrong
 
 " with a "clear showing that an established rule is incorrect and harmful"; (emphasis added; internal quotation marks omitted)
 
 Conway v. Wilton,
 
 supra, 238 Conn. at 660-61,
 
 680 A.2d 242
 
 ; and (2) "a court should not overrule its earlier decisions unless the
 
 most cogent
 
 reasons and
 
 inescapable logic
 
 require it." (Emphasis added; internal quotation marks omitted.)
 
 State v. Salamon,
 
 supra, 287 Conn. at 519,
 
 949 A.2d 1092
 
 .
 

 In my view, the precedential value of an older decision, unquestionably correct when decided, might well erode over time as the result of relevant changes in law and policy, thus rendering a decision to overrule it less of a shock to the stability of the court and the law. See S. Burton, "The Conflict Between Stare Decisis and Overruling in Constitutional Adjudication,"
 
 35 Cardozo L.Rev. 1687
 
 , 1703-1704 (2014) (describing threshold factors to examine before deciding merits of whether to overrule precedent, including: "[1] notice and predictability; [2] legal developments that make the precedent anomalous; [3] the precedent's workability; [4] reliance on the precedent; [5] the quality of the precedent court's reasoning; and [6] changes in factual circumstances that erode the precedent's justification" [footnotes omitted] ). Without the benefit of the lessons learned from watching a precedent's value evolve over time, I would require a far greater showing of error-near akin to that required to justify reconsideration of a decision under Practice Book § 71-5-to justify the overruling of a decision of extremely recent vintage, wherein nothing has changed other than the parties and the composition of the court. In my view, such an overruling would be appropriate only if the original decision evinced a complete misunderstanding of the governing legal principles, particularly if compounded by lack of meaningful adversarial input from the parties to the earlier case. See
 
 State v. DeJesus,
 

 288 Conn. 418
 
 , 437 and n. 14,
 
 953 A.2d 45
 
 (2008) (considering case law not addressed in
 
 State v. Sanseverino,
 

 287 Conn. 608
 
 , 625,
 
 949 A.2d 1156
 
 [ (2008) ], and overruling
 
 Sanseverino,
 
 which held, without briefing from parties, that appellate remedy in case when jury was not instructed in accordance with
 
 Salamon
 
 was judgment of acquittal rather than new trial before properly instructed jury); see also
 
 State v. Sanseverino,
 

 291 Conn. 574
 
 , 574-75,
 
 969 A.2d 710
 
 (2009) (following
 
 DeJesus
 
 in revised opinion issued after grant of state's motion for reconsideration);
 
 State v. Sanseverino,
 
 supra, 287 Conn. at 663,
 
 949 A.2d 1156
 
 (
 
 Zarella, J.,
 
 dissenting) (observing that majority decided remedy issue sua sponte with no argument or briefing from parties).
 

 At oral argument before this court, the state and members of the court discussed the concept of reliance by considering hypothetical questions about whether this court could ever overrule its constitutional pronouncement in
 
 Kerrigan v. Commissioner of Public Health,
 

 289 Conn. 135
 
 ,
 
 957 A.2d 407
 
 (2008), namely, that the previous state statutory prohibition against same sex marriage violated the constitution of Connecticut. Notwithstanding the United States Supreme Court's recent decision in
 
 Obergefell v. Hodges,
 
 --- U.S. ----,
 
 135 S.Ct. 2584
 
 , 2593,
 
 192 L.Ed.2d 609
 
 (2015), I recognize that the reliance concerns attendant to
 
 Kerrigan
 
 were numerically greater than those present in this case, insofar as the legislature changed the statutory scheme and thousands of our state's citizens were married in the eight years since this court's decision in
 
 Kerrigan.
 
 Given the life interest at issue here, I suggest that the reliance interests on
 
 Santiago
 
 of the defendant and others presently exposed to the death penalty differ only in kind, and not degree, from those of the couples who were married as a result of
 
 Kerrigan.
 

 The defendant in
 
 Santiago
 
 has already been resentenced to life imprisonment in accordance with this court's decision in that case. See
 
 State v. Santiago,
 

 319 Conn. 935
 
 ,
 
 125 A.3d 520
 
 (2015) (denying state's motion for stay of judgment).
 

 Justice Zarella criticizes my position with respect to stare decisis as flawed by the logical fallacy of "post hoc ergo propter hoc, or after this, therefore resulting from it." See Black's Law Dictionary (10th Ed. 2014) (defining "post hoc ergo propter hoc" as "[t]he logical fallacy of assuming that a causal relationship exists when acts or events are merely sequential"). He understands my view to be that, "[b]ecause the present appeal has been decided after a change in the court's membership, the change in the membership caused or was the reason to overturn
 
 Santiago.
 
 " I believe Justice Zarella misunderstands my position, which simply is one of correlation,
 
 not
 
 causation. As a theoretical matter, had the
 
 Santiago
 
 panel remained intact, it is theoretically possible that one member of the majority could have defected and voted in this case to overrule
 
 Santiago.
 
 Thus, I agree that, as a purely theoretical matter, the change in panel is merely correlative, rather than causational with respect to the potential overruling of
 
 Santiago.
 
 I, however, do not share Justice Zarella's optimism about the probable collective understanding on the part of those who are asked to accept our court's decisions as a consistent statement of what the law is, with respect to the potential overruling of
 
 Santiago.
 
 Hence, Justice Zarella and I irreconcilably, but respectfully, disagree about the public perception issues that would attend the overruling of
 
 Santiago
 
 so soon after it was decided. See also footnote 9 of this concurring opinion.
 

 To this end, I firmly disagree with Justice Zarella's observation that my position with respect to stare decisis in the present case amounts to a "suggestion that this court is bound, now and forever, to follow any decision, right or wrong, unless the panel that decided the previous case is identical to the panel that wishes to overrule that case." I do not believe any such thing, and to take such a position, would, as Justice Zarella observes, stand in contrast to the historical record. Indeed, as a practical matter, such a position would immobilize our case law and render it completely unable to adapt to changes in law and society. My prudential concerns with respect to the panel change and public perception concern the posture of this particular case, which is unique with respect to the juxtaposition of the controversy of the issue and the timing of the argument and decision.
 

 A very recent series of decisions in one of our sister states tells a cautionary tale about the perception of instability created by the rapid overruling of decisions upon the change of a state Supreme Court's membership. In
 
 Doe v. Thompson,
 

 373 P.3d 750
 
 , 769-72,
 
 2016 WL 1612872
 
 , *23-26 (Kan.2016), and two companion cases,
 
 State v. Redmond,
 

 371 P.3d 900
 
 , 904,
 
 2016 WL 1612917
 
 , *5 (Kan.2016), and
 
 State v. Buser,
 

 371 P.3d 886
 
 , 892,
 
 2016 WL 1612846
 
 , *7 (Kan.2016), the Kansas Supreme Court concluded, in four to three decisions, that certain 2011 amendments to that state's sex offender registration act-such as extension of registration periods, special notations on driver's licenses, and increased "active" availability of registrant information online-were punitive, rather than regulatory, in nature; this rendered their retroactive application to previously convicted sex offenders a violation of the ex post facto clause set forth in article one, § 10, of the United States constitution. One of the four jurists comprising the majority in those cases was a trial court judge who was temporarily assigned to hear cases because of a vacancy on the court created when one of the justices was appointed to a seat on the United States Court of Appeals for the Tenth Circuit. See
 
 Doe v. Thompson,
 
 supra, at 771 n. 1, *26 n. 1;
 
 State v. Redmond,
 
 supra, at 905 n. 1, *5 n. 1;
 
 State v. Buser,
 
 supra, at 892 n. 1, *7 n. 1.
 

 A new justice, Caleb Stegall, was subsequently appointed to the vacancy on the Kansas Supreme Court. After hearing argument in
 
 State v. Petersen-Beard,
 

 377 P.3d 1127
 
 , 1129,
 
 2016 WL 1612851
 
 , *1 (Kan.2016), Justice Stegall authored a four to three decision, which was released on the same day as
 
 Doe, Redmond,
 
 and
 
 Buser,
 
 and overruled those decisions. Id., at 1129, *1. The majority opinion in
 
 Petersen-Beard
 
 adopted large portions of the dissenting opinion in
 
 Doe,
 
 and concluded that the 2011 amendments to the sex offender registration act were not punishment and, therefore, could not be held to constitute cruel and unusual punishment under the Kansas constitution or the eighth amendment to the United States constitution. Id., at 1131-41, *4-16. As Justice Johnson, the author of the majority opinion in
 
 Doe, Redmond,
 
 and
 
 Buser,
 
 explained in his dissent, the court's conclusion in
 
 Petersen-Beard
 
 did not affect the judgments obtained in the prior three cases, notwithstanding a court-ordered delay in publication pending argument and a decision by a "newly constituted court" in
 
 Petersen-Beard,
 
 the "apparent rationale [of which] was to make the holding in [
 
 Doe, Redmond,
 
 and
 
 Buser
 
 ] applicable solely to the parties in those cases." Id., at 1143, *18; see also id. ("Plainly stated, all of those litigants won on appeal, and the [2011] amendments cannot be applied to them. But they had to wait for many months-unnecessarily in my view-to reap the benefits of their respective wins. I find that to be a denial of justice.").
 

 Interestingly, neither the majority nor the dissent in
 
 Petersen-Beard
 
 considered the doctrine of stare decisis, as it affected the Kansas court's obligation to follow its own recent precedents, with respect to that decision. Reaction to the rapid overruling was, however, widely noticed, and primarily attributed to the change in personnel of the Kansas Supreme Court. One scholarly commentator, Professor David Post, described the Kansas Supreme Court's action in
 
 Petersen-Beard,
 
 which required "all other ... sex offenders in the state with convictions before 2011" to register, while sparing the defendants in
 
 Doe, Redmond,
 
 and
 
 Buser,
 
 as "seem [ing] to violate the very fundamental notion, embedded in our idea of 'due process of law,' that like cases are to be treated alike-someone in precisely the same situation ... will have to register ... while [the defendants in
 
 Doe, Redmond,
 
 and
 
 Buser
 
 ] will not." D. Post, "In a Single Day, the Kansas Supreme Court Issues Important Constitutional Opinions-and Overrules Them," Washington Post (April 25, 2016), available at https://www.washingtonpost.com/news/volokh-conspiracy/wp/2016/04/25/in-a-single-day-the-kansas-supreme-court-issues-important-constitutional-opinions-and-overrules-them (last visited May 16, 2016). Discussing the change in the court's personnel, Professor Post describes as "a bit unseemly" the fact that "[t]his strange circumstance seems to have come about because the Kansas court was short-handed." Id.; see also D. Weiss, "Kansas Supreme Court Issues Three Opinions Then Overrules Them on the Same Day," ABA J. (April 25, 2016) ("[t]he reason for the change in stance was a new justice who joined the court, taking the place of a senior district judge who was filling a vacancy"), available at http://www.abajournal.com/news/article/kansas_supreme_court_issues_ three_opinions_then_overrules_them_on_the_same (last visited May 16, 2016); S. Greenfield, "What a Difference a Day Makes, Kansas Edition," Simple Justice: A Criminal Defense Blog (April 26, 2016), available at http://blog.simplejustice.us/2016/04/26/what-a-difference-a-day-makes-kansas-edition (last visited May 16, 2016) (An article observing that
 
 Petersen-Beard
 
 was inconsistent with the doctrine of stare decisis, and stating that the "problem arose because one seat at the Kansas Supreme Court was filled by one [judge in
 
 Doe
 
 ,
 
 Redmond
 
 , and
 
 Buser
 
 ], and another [judge in
 
 Petersen-Beard
 
 ]. The [c]ourt was split, three to three, on the issue, so that last [vote] was the tie breaker."); T. Rizzo, "Sex Offenders Win and Lose in 'Peculiar' Rulings by the Kansas Supreme Court," Kansas City Star (April 22, 2016), available at http://www.kansascity.com/news/local/crime/article73328242.html (last visited May 16, 2016) (quoting state attorney general's description of decisions as "peculiar" and stating that "[t]he highly unusual circumstance appear[s] to be the result of a one-justice change in the makeup of the court").
 

 Although public reaction should not sway our decisionmaking, I cannot ignore the likelihood, vividly illustrated by the reaction to the Kansas Supreme Court's recent decision in
 
 Petersen-Beard,
 
 that such rapid overruling of a major constitutional precedent would be attributed solely to the change in the court's composition. This indicates to me that overruling
 
 Santiago
 
 would present the risk of shaking our citizens' confidence in our court as an institution, betraying it as a collection of individuals who make seemingly arbitrary decisions. As I stated previously, the majority's analysis in
 
 Santiago
 
 is not so unreasonable or fundamentally flawed as to justify taking that risk in the public's confidence in this court, and the judiciary as a whole.
 

 Thus, I find wholly unpersuasive the state's arguments that
 
 Santiago
 
 "is no obstacle to this court issuing a correct legal decision on the question of whether capital punishment violates the state constitution," and that "the only result in [this case] that could undermine the public faith in the integrity of this court ... would be an affirmance of
 
 Santiago
 
 ... based on the principle of stare decisis. If [this] court believes that
 
 Santiago
 
 ... properly decided that capital punishment violates the Connecticut constitution, then it should so hold. But if a majority of this court believes that
 
 Santiago
 
 ... is incorrect, justifying affirmation of that breach through a statement that the court believes it tied its own hands would have a deleterious effect ... on the public's perception of the procedural fairness of the criminal justice system and diminish public confidence in the rule of law." (Citation omitted; internal quotation marks omitted.) In my view, any concerns in the public's confidence about this court's technical fidelity to the adversarial appellate decision-making process in
 
 Santiago
 
 -a matter on which the majority and dissent in that case disagreed energetically-are drastically outweighed by the public perception of arbitrariness that would result from the defendant in that case, Eduardo Santiago, getting to live, and the defendant in the present case facing the prospect of lethal injection, for no reason beyond the fact that Santiago's case happened to come up first on this court's docket and was heard by a slightly different panel of this court. See footnote 2 of this concurring opinion.
 

 It would be careless of me if I failed to mention that stare decisis has never been prominent in our capital punishment jurisprudence. Indeed, past justices convinced of the death penalty's unconstitutional status were unmoved by the doctrine of stare decisis and continually declined to join the court's decisions upholding capital punishment. For example, dissenting in part from the majority opinion in
 
 State v. Ross,
 

 230 Conn. 183
 
 ,
 
 646 A.2d 1318
 
 (1994), cert. denied,
 
 513 U.S. 1165
 
 ,
 
 115 S.Ct. 1133
 
 ,
 
 130 L.Ed.2d 1095
 
 (1995), Justice Berdon concluded that capital punishment was facially unconstitutional under our state constitution because it did not comport with the contemporary standards of decency. Id., at 286-87, 319, 334,
 
 646 A.2d 1318
 
 (
 
 Berdon, J.,
 
 dissenting in part). Despite this court's contrary holding in that case; id., at 256,
 
 646 A.2d 1318
 
 ; Justice Berdon continued to dissent in capital cases, arguing that the death penalty was per se unconstitutional. See, e.g.,
 
 State v. Cobb,
 

 251 Conn. 285
 
 , 523,
 
 743 A.2d 1
 
 (1999) (
 
 Berdon, J.,
 
 dissenting), cert. denied,
 
 531 U.S. 841
 
 ,
 
 121 S.Ct. 106
 
 ,
 
 148 L.Ed.2d 64
 
 (2000) ;
 
 State v. Webb,
 

 238 Conn. 389
 
 , 551,
 
 680 A.2d 147
 
 (1996) (
 
 Berdon, J.,
 
 dissenting);
 
 State v. Breton,
 

 235 Conn. 206
 
 , 260,
 
 663 A.2d 1026
 
 (1995) (
 
 Berdon, J.,
 
 dissenting). Similarly, the first time Justices Norcott and Katz decided a capital punishment case, they, too, felt unconstrained by precedent, such as
 
 Ross.
 
 In
 
 Webb,
 
 Justice Katz joined Justice Berdon's dissent, concluding that the death penalty was facially unconstitutional;
 
 State v. Webb,
 
 supra, at 551,
 
 680 A.2d 147
 
 ; and Justice Norcott concluded, in dissent, that the Connecticut capital penalty scheme violated the state constitution's prohibition against cruel and unusual punishment, although he would not say that the death penalty was unconstitutional in all cases. See id., at 566-67,
 
 680 A.2d 147
 
 (
 
 Norcott, J.,
 
 dissenting). Subsequently, in
 
 Cobb,
 
 Justice Norcott joined Justices Berdon and Katz in their belief that the death penalty was unconstitutional in all cases. See
 
 State v. Cobb,
 
 supra, at 543,
 
 743 A.2d 1
 
 (
 
 Norcott, J.,
 
 dissenting); see also
 
 id.,
 
 at 522-23 n. 1,
 
 743 A.2d 1
 
 (
 
 Berdon, J.,
 
 dissenting). Both Justices Norcott and Katz maintained their position throughout their tenure on this court; see, e.g.,
 
 State v. Santiago,
 

 305 Conn. 101
 
 , 307 n. 166,
 
 49 A.3d 566
 
 (2012) (Justice Norcott, writing for the majority, declined to examine constitutional challenge to capital punishment because it had been recently rejected by majority of this court in
 
 State v. Rizzo,
 

 303 Conn. 71
 
 , 184, 201,
 
 31 A.3d 1094
 
 [ (2011) ], cert. denied, --- U.S. ----,
 
 133 S.Ct. 133
 
 ,
 
 184 L.Ed.2d 64
 
 [ (2012) ], but he maintained that he remained steadfast in his own conclusion that death penalty does not comport with Connecticut constitution), superseded in part by
 
 State v. Santiago,
 

 318 Conn. 1
 
 ,
 
 122 A.3d 1
 
 (2015) ;
 
 State v. Rizzo,
 
 supra, at 202,
 
 833 A.2d 363
 
 (
 
 Norcott, J.,
 
 dissenting) ("I continue to maintain my position that the death penalty has no place in the jurisprudence of the state of Connecticut" [internal quotation marks omitted] );
 
 State v. Colon,
 

 272 Conn. 106
 
 , 395,
 
 864 A.2d 666
 
 (2004) (
 
 Norcott, J.,
 
 concurring) (Justice Norcott indicated that he continued to adhere to his " 'ongoing position' " that death penalty is unconstitutional but joined majority because judgment of court did not result directly in imposition of death, as court reversed defendant's death sentence), cert. denied,
 
 546 U.S. 848
 
 ,
 
 126 S.Ct. 102
 
 ,
 
 163 L.Ed.2d 116
 
 (2005) ;
 
 State v. Colon,
 
 supra, at 395,
 
 864 A.2d 666
 
 (
 
 Katz, J.,
 
 concurring and dissenting) ("I maintain my belief that the death penalty fails to comport with contemporary standards of decency and thereby violates our state constitution's prohibition against cruel and unusual punishment" but "concur ... because ... I have an obligation to decide the issue before the court" [internal quotation marks omitted] );
 
 State v. Peeler,
 

 271 Conn. 338
 
 , 464,
 
 857 A.2d 808
 
 (2004) (
 
 Katz, J.,
 
 with whom
 
 Norcott, J.,
 
 joins, dissenting) ("[a]dhering to ... view that the death penalty is, in all circumstances, cruel and unusual punishment prohibited by the constitution"), cert. denied,
 
 546 U.S. 845
 
 ,
 
 126 S.Ct. 94
 
 ,
 
 163 L.Ed.2d 110
 
 (2005) ;
 
 State v. Rizzo,
 

 266 Conn. 171
 
 , 313-14,
 
 833 A.2d 363
 
 (2003) (
 
 Norcott, J.,
 
 concurring) (noting continued belief that death penalty cannot " 'be administered in accordance with the principles of fundamental fairness set forth in our state's constitution' " but joining majority because decision related to procedural safeguards in imposing ultimate punishment and did not directly result in imposition of death sentence);
 
 State v. Rizzo,
 
 supra,
 
 266 Conn. at 314
 
 ,
 
 833 A.2d 363
 
 (
 
 Katz, J.,
 
 concurring and dissenting) ("I maintain my belief that the death penalty ... violates our state constitution's prohibition against cruel and unusual punishment.... Nevertheless, I address the issue pertaining to the burden of persuasion for the imposition of the death penalty because ... I have an obligation ... to decide the issue before the court...." [Citation omitted; internal quotation marks omitted.] );
 
 State v. Reynolds,
 

 264 Conn. 1
 
 , 254,
 
 836 A.2d 224
 
 (2003) (
 
 Katz, J.,
 
 dissenting) (maintaining belief that death penalty violates state constitution's prohibition against cruel and unusual punishment), cert. denied,
 
 541 U.S. 908
 
 ,
 
 124 S.Ct. 1614
 
 ,
 
 158 L.Ed.2d 254
 
 (2004) ;
 
 State v. Courchesne,
 

 262 Conn. 537
 
 , 583-84,
 
 816 A.2d 562
 
 (2003) (
 
 Norcott, J.,
 
 concurring) (maintaining opposition to constitutionality of death penalty but joining majority because it addressed narrow procedural question and because imposition of death penalty would not necessarily follow as direct consequence of majority's decision);
 
 State v. Courchesne,
 
 supra, at 584-85,
 
 816 A.2d 562
 
 (
 
 Katz, J.,
 
 concurring and dissenting) (same);
 
 State v. Webb,
 

 252 Conn. 128
 
 , 147,
 
 750 A.2d 448
 
 (
 
 Norcott, J.,
 
 dissenting) (expressing continued opposition to death penalty), cert. denied,
 
 531 U.S. 835
 
 ,
 
 121 S.Ct. 93
 
 ,
 
 148 L.Ed.2d 53
 
 (2000) ;
 
 State v. Webb,
 
 supra,
 
 252 Conn. at 147
 
 ,
 
 750 A.2d 448
 
 (
 
 Katz, J.,
 
 dissenting) ("I continue to believe that the death penalty ... violates our state constitution's prohibition against cruel and unusual punishment"); despite this court's numerous decisions to the contrary. See, e.g.,
 
 State v. Rizzo,
 
 supra, 303 Conn. at 201,
 
 31 A.3d 1094
 
 ("[w]e conclude that the death penalty, as a general matter, does not violate the state constitution");
 
 State v. Colon,
 
 supra, at 383,
 
 864 A.2d 666
 
 (rejecting invitation to reconsider decisions holding death penalty constitutional because court was not convinced that previous decisions were wrong);
 
 State v. Reynolds,
 
 supra, at 236-37,
 
 836 A.2d 224
 
 (same);
 
 State v. Webb,
 
 supra, 238 Conn. at 401,
 
 680 A.2d 147
 
 (disagreeing with defendant's claim that "the death penalty statutes facially violate ... article first, §§ 8 and 9, of the Connecticut constitution");
 
 State v. Ross,
 
 supra, at 251,
 
 646 A.2d 1318
 
 (rejecting claim that death penalty is cruel and unusual in all circumstances).
 

 In my view, it is appropriate for our capital punishment jurisprudence to take little notice of stare decisis. The stakes in capital cases are high-life or death-and it is unlikely that any justice of this court will be unsure of the constitutional status of the ultimate punishment, whether he or she believes that it is constitutional or unconstitutional. It seems that the best decision-making policy in this arena, in which our holdings are of great constitutional, moral, and practical magnitude, is to allow each justice to reach an independent judgment regarding the death penalty's constitutionality, while giving little weight to stare decisis. In the present case, however, the concurring justices heavily weigh stare decisis and thereby prevent each justice from reaching an independent judgment regarding the constitutionality of the death penalty.
 

 See also
 
 State v. Santiago,
 
 supra,
 
 318 Conn. at 277-78
 
 ,
 
 122 A.3d 1
 
 (
 
 Rogers, C.J.,
 
 dissenting) ("The majority's decision to strike down the death penalty in its entirety is a judicial invalidation, without constitutional basis, of the political will of the people. It is this usurpation of the legislative power-not the death penalty-that violates the societal mores of this state as expressed in its fundamental law."); id., at 341,
 
 122 A.3d 1
 
 (
 
 Rogers, C.J.,
 
 dissenting) ("the majority has addressed issues that the defendant did not raise, has relied on extra-record materials that the parties have not had an opportunity to review or to rebut, has failed to provide the state with an opportunity to respond to its arguments and conclusions and, finally, in reaching the decision that it has today, has unconstitutionally usurped the role of the legislature").
 

 This inconsistent application is best illustrated by a juxtaposition of cases in which this court overruled precedent with cases in which this court has upheld precedent. In many instances in which this court decides to overrule a previous case, it is not due to the clarity of the error in the previous case or because the most cogent reasons and inescapable logic required it. Instead, it is simply because a majority of the members of the panel reaches a different conclusion than the majority of the previous panel. See, e.g.,
 
 Campos v. Coleman,
 

 319 Conn. 36
 
 , 43,
 
 123 A.3d 854
 
 (2015) (overruling
 
 Mendillo v. Board of Education,
 

 246 Conn. 456
 
 ,
 
 717 A.2d 1177
 
 [ (1998) ], in recognizing new cause of action after reconsidering five policy factors court addressed in
 
 Mendillo
 
 and simply reaching different conclusion regarding weight and balance of those factors, and stating that it "now agree[s] with the concurring and dissenting opinion in
 
 Mendillo
 
 that the public policy factors favoring recognition of [the] cause of action ... outweigh those factors disfavoring recognition");
 
 State v. Salamon,
 

 287 Conn. 509
 
 , 542,
 
 949 A.2d 1092
 
 (2008) (overruling more than thirty years of precedent interpreting Connecticut's kidnapping statutes, which had not required proof that defendant had restrained victim for longer period or to greater degree than necessary to commit other charged crimes without explaining why, or even if, that prior precedent was clearly wrong);
 
 Craig v. Driscoll,
 

 262 Conn. 312
 
 , 328-30, 340,
 
 813 A.2d 1003
 
 (2003) (implicitly overruling more than one century of case law denying common-law negligence action against purveyor of alcoholic beverages for injuries caused by intoxicated patron without so much as stating that case law was wrong, justifying new cause of action on basis that it would further objectives of state's Dram Shop Act, which was enacted with knowledge that no common-law negligence action would lie for such injuries, and overruling
 
 Quinnett v. Newman,
 

 213 Conn. 343
 
 ,
 
 568 A.2d 786
 
 [ (1990) ], which concluded that legislature had occupied field when it enacted Dram Shop Act, but noting that such conclusion was inconsistent with court's holding to contrary in
 
 Kowal v. Hofher,
 

 181 Conn. 355
 
 ,
 
 436 A.2d 1
 
 [ (1980) ] ). Contrarily, in instances in which we uphold precedent, we trumpet the clearly wrong and most cogent reasons and inescapable logic standards. See, e.g.,
 
 State v. Ray,
 

 290 Conn. 602
 
 , 614-16,
 
 966 A.2d 148
 
 (2009) (denying defendant's invitation to overrule prior cases concluding that, under General Statutes § 21a-278 [b], defendant must prove that he or she is drug dependent, noting that, "[i]f [it had been] writing on a blank slate, [it] might [have found] persuasive the defendant's argument[s]," and noting that defendant's arguments were supported by statute's text, chronology of statutes, and legislative history but were raised and rejected in
 
 State v. Hart,
 

 221 Conn. 595
 
 ,
 
 605 A.2d 1366
 
 [ (1992) ], and defendant had presented "no developments in the law, no potential for unconscionable results, no irreconcilable conflicts and no difficulties in applying [the court's] construction of § 21a-278 [b]" and therefore had not demonstrated that previous cases were clearly wrong or that most cogent reasons and inescapable logic required overruling of them). To further illustrate our inconsistent application of this doctrine, I point the reader to the countless cases in which we overrule precedent without even a mere mention of stare decisis. In fact, my research has uncovered at least twenty-six such cases since I have joined this court. See, e.g.,
 
 Grey v. Stamford Health System, Inc.,
 

 282 Conn. 745
 
 , 757,
 
 924 A.2d 831
 
 (2007) ;
 
 Batte-Holmgren v. Commissioner of Public Health,
 

 281 Conn. 277
 
 , 289,
 
 914 A.2d 996
 
 (2007) ;
 
 Kerrigan v. Commissioner of Public Health,
 

 279 Conn. 447
 
 , 455,
 
 904 A.2d 137
 
 (2006) ;
 
 RAL Management, Inc. v. Valley View Associates,
 

 278 Conn. 672
 
 , 691,
 
 899 A.2d 586
 
 (2006) ;
 
 Right v. Breen,
 

 277 Conn. 364
 
 , 377,
 
 890 A.2d 1287
 
 (2006) ;
 
 Alexson v. Foss,
 

 276 Conn. 599
 
 , 608 n. 8,
 
 887 A.2d 872
 
 (2006) ;
 
 State v. Singleton,
 

 274 Conn. 426
 
 , 438,
 
 876 A.2d 1
 
 (2005) ;
 
 State v. Cruz,
 

 269 Conn. 97
 
 , 106,
 
 848 A.2d 445
 
 (2004) ;
 
 State v. Crawford,
 

 257 Conn. 769
 
 , 779-80,
 
 778 A.2d 947
 
 (2001), cert. denied,
 
 534 U.S. 1138
 
 ,
 
 122 S.Ct. 1086
 
 ,
 
 151 L.Ed.2d 985
 
 (2002) ; see also footnote 30 of this opinion (citing cases spanning from 2007 to 2016). In highlighting the cases cited in this footnote and footnote 30 of this opinion, I do not mean to suggest that any of the overrulings were improper. I express no opinion in that regard. Instead, I use these cases simply to illustrate the point that our jurisprudence in this area is weak and inconsistent.
 

 I note that a plurality of justices, Justices Palmer, Eveleigh, and McDonald, need not resort to stare decisis because they continue to believe that
 
 Santiago
 
 is correct. Thus, any discussion of stare decisis as a rationale for affirming
 
 Santiago
 
 is unnecessary. Nonetheless, those justices do address stare decisis.
 

 The United States Supreme Court has suffered such criticism at the hands of numerous academic writers precisely because it has inconsistently applied its stare decisis doctrine. See, e.g., C. Cooper, "Stare Decisis: Precedent and Principle in Constitutional Adjudication,"
 
 73 Cornell L.Rev. 401
 
 , 402 (1988) (characterizing stare decisis as "a doctrine of convenience, to both conservatives and liberals" and stating that "[i]ts friends, for the most part, are determined by the needs of the moment"); M. Paulsen, "Does the Supreme Court's Current Doctrine of Stare Decisis Require Adherence to the Supreme Court's Current Doctrine of Stare Decisis?,"
 
 86 N.C. L.Rev. 1165
 
 , 1209 (2008) ("Notions of 'judicial integrity' would seem to require acknowledgment that stare decisis is a doctrine of convenience, endlessly pliable, followed only when desired, and almost always invoked as a makeweight.... [I]t [is] a 'Grand Hoax.' ").